IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  13-cv-03264-LTB

JAPHETH A. PAULEK,

        Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

        Defendant.

_____

ORDER
_____

        Plaintiff, Japheth A. Paulek, appeals from the Social Security Administration ("SSA")

Commissioner's final decision denying his application for disability insurance benefits, filed

pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and his application for

supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C.

§§ 1381-1383c.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral argument would not

materially assist me in the determination of this appeal.  After consideration of the parties'

briefs, as well as the administrative record, I AFFIRM the Commissioner's final order.

## I.  STATEMENT OF THE CASE

        Plaintiff seeks judicial review of the Commissioner's decision denying his applications

for disability insurance benefits and for supplemental security income filed on January 12, 2011.

[Administrative Record ("AR") 129, 165, 801]  After the applications were initially denied in

May of  2011 [AR 72], an Administrative Law Judge ("ALJ") conducted an evidentiary hearing

on November 15, 2012, and issued a written ruling on November 29, 2012. [AR 830, 23]  The

ALJ denied Plaintiff's applications on the basis that he was not disabled because he was capable

of performing past relevant work (Step Four). [AR 23-36]  The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. [AR 12] Plaintiff timely filed his complaint with this court seeking review of the Commissioner's decision.

## II. FACTS

Plaintiff was born on November 25, 1977, was thirty years old at the time of his alleged disability onset date (of July 1, 2008), had attended special education classes in elementary school and dropped out of school in eighth grade. [AR 193, 872]  His past relevant work history was as a cashier, gas station clerk, painter and driver. [AR 215, 875-77]  In his applications, Plaintiff alleged he became disabled in July of 2008, due to Type 1 diabetes, back injury, depression, arthritis, fibromyalgia, and neuropathy in his legs. [AR 122]  Plaintiff's last date of insured was December 31, 2009. [AR 122]

Plaintiff developed Type 1 diabetes mellitus when he was 14 years old. [AR 529, 750] The earliest medical records reveal that Plaintiff sought general health care from Mark A. Perea, M.D., who he saw two or three times a year. [AR 661-87] On December 10, 2005, Dr. Perea assessed Plaintiff's active problems as:  Type 1 DM, Neuropathy, HTN, Gastropatesis and GERD. [AR 662]  In July of 2007, Plaintiff complained to Dr. Perea of bilateral lumbar pain, but a subsequent MRI revealed very mild degenerative changes. [AR 670, 672, 682]   Upon continued complaints, Dr. Perea ordered physical therapy on January 31, 2008. [AR 676, 266, 271]  Plaintiff underwent hernia repair surgery in October of 2008. [AR 678, 272-87]

During this time, Plaintiff returned to the Barbara Davis Center for Diabetes Care, in April of 2008, in order to managed his diabetes. [AR 508-52, 579-606]   The initial records, dated April 7, 2008, indicates a diagnosis of diabetes mellitus, diabetic nephrology (albuminuria) or kidney disease, depression/anxiety and GERD/gastroperesis. [AR 541]  A systems review indicated mild peripheral sensory neuropathy and anxiety/depression. [AR 536]  It is clear from the Barbara Davis Center records – from April 2008 through May 2012 – that Plaintiff's attempts to manage his blood glucose levels were unsuccessful, and his diabetes was not well controlled. [AR 508-52, 579-606, 633-60]  Starting in June of 2009, Plaintiff reported regularly to the Emergency Department complaining of bilateral leg pain, vomiting, headaches and low blood sugar issues. [AR 288, 689-96, 298]

Commencing on October 22, 2009, Plaintiff began seeing Dr. Hai Bui and Kathryn Bouchard, APN at Lakewood Medical Center almost monthly through February 2011.  [AR 443-504] At his initial visit, on October 22, 2009, Dr. Bui noted Plaintiff's uncontrolled diabetes and neuropathy of the lower extremeties. [AR 504]  Ms. Bouchard subsequently ordered physical therapy for Plaintiff's lower back pain  – following lumbar spine MRI results dated January 21, 2010 which showed equivocal facet sclerosis at L5-S1 [AR 397, 708-10, 494, 497]  On February 25, 2010 Ms. Bouchard referred him for a steroid injection. [AR 489] During this time, Plaintiff continued to report to the Emergency Department for treatment for right foot pain, headaches, vomiting and hypoglycimia. [AR 319-38, 697, 711-16, 406, 717-22, 381, 368, 416, 425, 607]

On March 11, 2010, Plaintiff underwent another MRI which showed "disc dessication at T12-L1 with mild disc space narrowing at T11-T12 and T12-L1. Schnori's node at superior endplate of T12. Mild focal degenerative marrow signal at the superior

3

endplate of L1." [AR 412]  It also revealed  "mild disc dessication throughout the cervical spine with mild disc bulges but not significant central canal stenosis." [AR 412] Plaintiff was then seen by Phillip L. Engen, MD at the Clear Creek Surgery Center. [AR 351, 724-27]  Dr. Engen's impressions were: L5-S1 facet arthropathy, right sacroiliac joint disfunction, probable fibromyalgia, probable sleep apnea, probable periodic limb movement disorder, diabetes, diabetic gastoparesis and peripheral neuropathy. [AR 726]  He recommended various therapies, but noted that blood sugar control would best control Plaintiff's pain and he would not consider interventional therapy until he had better glucose control long term. [AR 726]  Also at this time Plaintiff saw Dr. Jennifer Jansen on March 11, 2010, at National Jewish Health for assessment and diabetes management. [AR 360-67, 750-57]

On March 26, 2010, Ms. Bouchard assessed fibromyalgia. [AR 483]  On July 16, 2010, Ms. Bouchard noted Plaintiff's back and leg pain was "most likely neuropathy" as Plaintiff's diabetes was uncontrolled and he reported paresthesia, tingling and numbness. [AR 471-73] Later, in September of 2010, she again noted leg pain that is neuropathic and progressive, and she assessed polyneuropathy. [AR 465]  On February 1, 2011, Ms. Bouchard noted his continued leg pain, due to poor blood sugar control, and increased depression. [AR 443]

Plaintiff's treatment notes from the Barbara Davis Center, from February of 2011 through May 2012, indicate poor/suboptimal blood sugar control. [AR 580-605] At his visit on October 25, 2011, it was noted that he complications included nephropathym retinopathy and gastroparesis. [AR 590]  His diagnosis at that time was:  DM renal manif. type 1; diabetic nephropathy; depression with anxiety; GERD (gastroesophageal reflux disease); and hyperlipdemia. [AR 593]

4

On September 27, 2011, Ms. Bouchard assessed Plaintiff for the Jefferson County Social Services and the Colorado Works Program. [AR 553-69] Ms. Bouchard indicated a diagnosis of: Type 1 diabetes, severe, difficult to control; polyneuropathy, severe and progressive; and depression, moderate to severe and related to chronic disease. [AR 554]  She opined that Plaintiff was unable to work. [AR 556]  Ms. Bouchard filled out a "Diabetes Mellitus Medical Source Statement" indicating Plaintiff's symptomology, with a "fair" prognosis, and that he was "progressively worsening over clinical course." [AR 558]  She indicated that Plaintiff's "fluctuating blood sugar and progressive neuropathy has severe effect on [his] balance, stamina, fatigue and pain" and that his depression affected his physical condition. [AR 558]  Ms. Bouchard opined that Plaintiff could:  walk about one to two city blocks without rest or severe pain; sit 15 minutes and stand and walk 15 minutes at one time; and stand and walk about 2 hours total in an eight-hour working day. [AR 563]  In addition, she opined that Plaintiff could lift 10 pounds occasionally, 20 pounds rarely, and never lift 50 pounds. [AR 564] She opined that he could twist and crouch occasionally, stoop rarely, and never climb ladders or stairs. [AR 564] She indicated he could grasp and twist, perform fine manipulations, reach in front and reach overhead only 10% of the time, and that he should avoid exposure to extreme cold, extreme heat, soldering fluxes, solvents and cleaners, fumes, odors and gases, dust and chemicals. [AR 564] Finally, she indicated he would need to be off task for 25% of the time or more; he was incapable of even "low stress" work; and he would likely have to be absent from work more than four days a month. [AR 565]

On April 6, 2012, Richard Carson, M.D., performed a state agency physical exam and filled out a "Medical Source Statement of Ability To Do Work-Related Activities" form. [AR

570-78] After examination, Dr. Carson's impressions were: "Insulin dependent diabetes mellitus with a mild sensory neuropathy. He has chronic pain." [AR 572]  In assessing his functional capacity, Dr. Carson based his restrictions on Plaintiff's "diabetes, neuropathy and chronic pain syndrome."  [AR 572]  Specifically, Dr. Carson opined that Plaintiff could frequently lift and carry up to 10 pounds, and he could sit for 30 minutes, stand for 30 minutes, and walk for 30 minutes without interruption, for a total of six hours standing and 6 hours walking in an eight-hour work day. [AR 573-4] In addition, he could: use his hands continuously; operate foot controls occasionally; occasionally climb stairs and ramps, ladders and scaffolds, stoop and crouch; and could frequently balance, kneel and crawl. [AR 575-6]  Dr. Carson also assessed a number of applicable environmental limitations including no exposure to unprotected heights, moving mechanical parts, extreme cold, and vibrations, and only occasional exposure to operating a motor vehicle, dust, odors, fumes and pulmonary irritants, and extreme heat. [AR 577]

Thereafter, on July 13, 2012, Plaintiff underwent an electromyogram and nerve conduction study (an EMG/NCS) of his upper and lower extremities. [AR 629-31]  The nerve study revealed "evidence of  mild . . . sensory and motor polyneuropathy most likely from his diabetes . . . . He also has a mild left ulnar neuropathy at the left wrist possible from an old injury. Based on his history, he probably also has a small fiber neuropathy." [AR 629]

Plaintiff's medical records occasionally indicate a diagnosis of depression and/or anxiety without treatment. [AR 541, 536, 443, 585, 554]  Then, on July 12, 2010, Plaintiff walked in to Jefferson Center for Mental Health seeking care for his depression and stress. [AR 758-71]  On intake, his diagnosis was Major Depressive Disorder, Single Episode, Moderate and his global

assessment of functioning (GAF) was assessed at 50. [AR 758]  He reported decreased appetite, decreased energy, depressed mood, guilt ruminations, anxiety/irritability, tearfulness, and social isolation. [AR 759-64]

On July 21, 2010, Plaintiff underwent a state agency Adult Comprehensive Psychiatric Consultation with Michelle Warfield, Ph.D. [AR 775-78]  Dr. Warfield's interview indicated that he had "no history of depressive episodes and no symptoms of depression" until recently, within the last 6 months "when he became less motivated 'because of my pain.'" [AR 777] Plaintiff "reports current depressive symptoms of lack of concentration, no energy, sadness with occasional crying and agitation and irritability" but shows no symptoms of mania, psychosis or anxiety. [AR 777]  Dr. Warfield diagnosed Plaintiff with adjustment disorder with depressed mood, chronic, and assigned him a GAF score of 60. [AR 778]  Dr. Warfield concluded that Plaintiff would "need assistance in managing his funds due to limited cognitive abilities" and that he:

> appears to be experiencing symptoms of depression related to chronic medical problems. His cognitive abilities appear limited. He should be able to understand, remember and carry out simple one-step instructions, but would likely have marked difficulty understanding and carrying out complex instructions. The claimant appears mild-mannered however, in his interaction during the interview, thus it is thought that it is likely he is mild-mannered in social interactions and would be able to do some limited work. [AR 778]

At Plaintiff's hearing, Alan J. Coleman, M.D. – an internist who testified to having "done an awful lot of endocrinology" – testified as a medical expert. [AR 847-848]  Dr. Coleman testified that Plaintiff's physical impairments come from the chronic complications of his long-standing Type 1 insulin-dependent diabetes. [AR 848]  Specifically, he identified: diabetic neuropathy or nerve damage at his lower extremities; diabetic retinopathy or diabetic eye

disease; and diabetic nephropathy or diabetic kidney disease. [AR 848-49]  He further testified that of the three complications, only the diabetic neuropathy/nerve damage to his lower extremities could constitute a severe impairment. [AR 850]  Dr. Coleman testified that Plaintiff indicates he is in pain and "I think that he's probably got some neuropathy, although it isn't documented by examination." [AR 854]  However, while the records are clear that Plaintiff has had uncontrolled diabetes for a long time, and it would not be surprising that he would have some nerve damage, "it's not documented by anything in the medical record" and "I don't think that we have anything that strongly corroborates a diagnosis of severe neuropathy."  [AR 854-55]  Instead, Dr. Coleman believed that he would need limitations to his activities in that he could:  be "up on his feet for an aggregate of four hours in a eight-hour day and sit for a total of six hours;" lift 20 pounds occasionally and 10 frequently; and "[c]limb stairs, climb a ladder, bend, stoop, kneel, crawl occasionally." [AR 855-56]  When asked about the effect of his back pain, Dr. Coleman indicated that while he complains of chronic back pain, he does not have a herniated disk or sciatica and "[h]is examinations have been normal and have ruled out any sort of nerve damage" and "[t]here's no evidence that it's a severely limiting back pain." [AR 859]  He also indicated that his fibromyalgia constitutes a syndrome of chronic pain. [AR 859]  Ultimately, Dr. Coleman acknowledged that Plaintiff was in pain, but that because all the examinations showed that his strength was good, Plaintiff's pain had "not risen to the level of severe impairment." [AR 859]

Plaintiff testified about his abilities to walk (15 minutes to walk a half block) and climb stairs (occasionally he takes two flights of stairs to visit niece, and uses both handrails if available). [AR 850-52]  He testified that he didn't know how much weight he could lift, but that

the heaviest thing he has lifted recently was a gallon of milk. [AR 852-53]  He also testified that

he can't sit for longer that 15-20 minutes, and could only walk for 10-15 minutes. [AR 853]

Beyond his diabetes, Plaintiff testified that his pain – which is everywhere in his body, but

specifically on his left side – is terrible every single day and that he still experiences hernia pain.

[AR 864-66]  He also testified to difficulty focusing when his blood sugar fluxuates. [AR 870]

He indicated that he drives, but only for short periods of time, and that his days consist of

watching tv and occasionally sweeping the floor. [AR 872-73]  He also testified that he doesn't

sleep well due to the pain (two hours overnight), and he tries to nap for an hour every afternoon.

[AR 867, 873]

Mark Brauer, a vocational expert, also testified at the hearing. [AR 879-83]  He testified

that a hypothetical individual who could:  frequently lift and carry up to 10 pounds; sit 30

minutes at a time for a total of six hours in an eight-hour work day; stand 30 minutes at a time

for a total of six hours in an eight-hour work day; occasionally operate foot controls, climb,

stoop, and crouch; not be exposed to unprotected heights, moving mechanical parts, extreme

cold or vibration; and tolerate occasional exposure to the operation of motor vehicles, dust,

orders, fumes, pulmonary irritants and extreme heat, as well as can understand, remember and

carry out only simple work instructions, could perform Plaintiff's past work as a self-service

station attendant and as a cashier. [AR 879-80]  In response to questioning by Plaintiff's

attorney, the vocational expert testified that if the hypothetical person was also limited to only

occasional interaction with the public and co-workers, the person could not perform those past

work and if further limited to alternating between sitting and standing every 30 minutes, and

limited in math and reasoning to be not more than a level two, no work would exist in the

national economy. [AR 880-83]

## III. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520 (e)&(f), 416.920(e)&(f). Finally, if the claimant establishes a *prima facie* case of disability based on the

10

four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the

burden to demonstrate that the claimant has the residual functional capacity to perform other

work in the national economy in view of his age, education and work experience.  *See* 20 C.F.R.

§§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since July 2,

2008, the alleged onset date (Step One). [AR 29]  The ALJ further determined that Plaintiff had

the severe physical impairments of insulin-dependent diabetes mellitus type 1 with neuropathy

and mild retinopathy and nephropathy, GERD, chronic low back pain, fibromyalgia, and

depression (Step Two), but that these impairments did not meet or medically equal a listed

impairment deemed to be so severe as to preclude substantial gainful employment (Step Three).

[AR 29-30]

The ALJ then determined that Plaintiff retained the ability to perform light work, except

that: he is limited in his ability to sit/stand and walk for periods of time during an 8-hour work

day; he can only occasionally use foot controls, climb, stoop and crouch; he can never be

exposed to unprotected heights, moving mechanical parts, extreme cold and vibration; he can

only tolerate occasionally exposure to extreme heat, dusts, odors, fumes and pulmonary irritants;

and he can only drive occasionally as part of his work duties.  Mentally, he is able to understand,

remember and carry out simple instructions. [AR 31]  Based on this residual functional capacity

("RFC") assessment and the testimony from the vocational expert, the ALJ determined that

Plaintiff was capable of performing past relevant work as a service station attendant. [AR 35]  As

a result, the ALJ concluded that Plaintiff was not disabled at Step Four of the sequential

11

evaluation process and, therefore, was not under disability as defined by the SSA.

## V. STANDARD OF REVIEW

This court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).   Thus, the function of my review is "to determine whether the findings of fact  . . . are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987)(*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971)).  I may not re-weigh the evidence or substitute my judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).  With regard to the application of the law, reversal may be appropriate when the SSA Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

# VI.  ISSUES ON APPEAL

**A. Assessment of Opinion Evidence**:

On appeal, Plaintiff argues that the ALJ's reliance on the opinions of Dr. Coleman and Dr. Warfield, when assessing his RFC limitations, was erroneous.  Plaintiff first asserts that the ALJ's reliance on Dr. Coleman's opinion was improper because it was not supported by sufficient evidence.

Dr. Coleman testified as a medical expert at Plaintiff's hearing. [AR 847-56]  As discussed above, Dr. Coleman opined that the medical records reveal Plaintiff has some physical impairment from the complications of his long-standing Type 1 diabetes in the form of diabetic eye disease, diabetic kidney disease and diabetic neuropathy/nerve damage in his lower extremities. [AR 848-49]  Dr. Coleman further testified that while he believes that Plaintiff "probably [has] some neuropathy . . . it's not documented by anything in the medical record" and there is nothing "that strongly corroborates a diagnosis of severe neuropathy."  [AR 854-55]   As to Plaintiff's limitations due to his back pain, Dr. Coleman indicated that he does not have a herniated disk or sciatica and "[t]here's no evidence that it's a severely limiting back pain." [AR 859]  As such, Dr. Coleman opined that Plaintiff could: be up on his feet for an aggregate of four hours in a eight-hour day and sit for a total of six hours; lift 20 pounds occasionally and 10 pounds frequently; and occasionally climb stairs, climb a ladder, bend, stoop, kneel, and crawl. [AR 855-56]

In assessing Plaintiff's RFC, the ALJ determined that:

[A]s observed by Dr. Coleman, the medical expert, there are no significant objective findings to support a diagnosis of diabetic neuropathy. Dr. Coleman noted several instances in the record where despite [Plaintiff's] alleged pain he had normal neurologic findings of the lower extremities, including normal sensation, strength and reflexes.  He opines that such findings were not consistent with true nerve damage and that indeed at least one examining doctor described [Plaintiff's] pain as muscular in nature.  Dr. Coleman conceded that [Plaintiff] has had consistent complains of neuropathic pain, but in the absence of substantiating objective findings he did not think this was a severe condition. [AR 33]

. . .

Dr. Coleman also observed that despite [Plaintiff's] complaints of low back pain problems, and reported history of a 1998 back injury, he has consistently had normal examinations of the spine and lower extremities, failing to support any significant limitations caused by this complaint.  In this regard, Dr. Coleman found there to be no support for the consultive examiner's [Dr. Carson's] restriction to only 10 pounds maximum lifting.  Dr. Coleman instead found [Plaintiff] capable of lifting up to 20 pounds occasionally and 10 pounds frequently, restrictions that appear to be supported by the entirety of the medical record.  Indeed, the undersigned notes that at the time of Dr. Carson's April 2012 physical examination of [Plaintiff, he] had essentially normal spinal range of motion, normal gait and intact sensory examination. [Plaintiff] moved about normally and did not shift positions while sitting.  He was diffusely, but only mildly tender in the legs and arms.  This is consistent with other examination findings suggesting probable fibromyalgia based on multiple tender points. [AR 33-34]

Furthermore, the ALJ noted that Dr. Coleman testified at the hearing that Ms. Bouchard's opinion that Plaintiff was limited to sitting about 2 hours and standing and/or walking about 2 hours in an 8-hour day, as well as that he would miss more than four workdays per month, were limitations not supported by the objective medical record. [AR 34]  In so doing, the ALJ found that Dr. Coleman "specifically noted that Ms. Bouchard's mention of blurred vision is not documented in the record and that generally the degree of functional impairment indicated . . . is not supported by the medical evidence." [AR 34]  The ALJ indicated that he "has independently reviewed the available medical record and agrees with Dr. Coleman's assessment on this issue." [AR 34]

The ALJ also determined that the restriction to only 10 pounds maximum lifting "does not seem supported by the clinical findings of Dr. Carson [the consultive examiner] or any other objective medical findings in the record." [AR 33]  The ALJ further determined, however, that:

> Dr. Carson went on to find [Plaintiff] capable of sitting up to 30 minutes at a time and 6 hours in an 8-hour day, standing 30 minutes at a time for 6 hours in an 8-hour day, and walking 15 minutes at a time.  These restrictions comport with the residual functional capacity found herein.  Dr. Carson also gave restrictions on postural and manipulative functioning, and environmental limitations, which support the assessment above.  In this regard, the consultive examination findings and opinion of Dr. Carson have been given great weight. [AR 34]

Plaintiff now argues that the ALJ's assessment of Dr. Coleman's opinion as to Plaintiff's physical limitations is not supported by sufficient evidence.  He argues that the ALJ's analysis of Dr. Coleman's opinion did not follow 20 C.F.R. §404.1527 and §416.927 because the opinion was not supportable, and was inconsistent with the record as a whole.  Most particularly, he argues that Dr. Coleman's opinion failed to address the nerve conduction study dated July 13, 2012 [AR 629-3] and an MRI of his spine dated March 2010. [AR 412]  In his reply, Plaintiff concedes that the ALJ is not required to address every piece of medical evidence in the record, but argues that the ALJ's reliance on Dr. Coleman's opinions constituted error because they were based on a *lack* of evidence in the record when, such testing was, in fact, contained in the record.

As an initial matter, I disagree that Dr. Coleman's opinion was based on a lack of medical evidence; rather, it is clear that his opinions were based on examination findings that revealed that while Plaintiff suffered from pain, his strength and range of motion revealed that he was limited, but not disabled, by his pain.  Moreover, I agree with the Commissioner that the objective test results in the record, while not discussed, were consistent with the opinion of Dr.

15

Coleman that although Plaintiff was impaired by his neuropathy and pain, he was not limited to the degree of severity opined by Ms. Bouchard.  The nerve conduction study revealed only "evidence of  mild … sensory and motor polyneuropathy most likely from his diabetes …" and "[b]ased on his history, he probably also has a small fiber neuropathy." [AR 629]  Likewise, the MRI of his spine revealed "disc dessication at T12-L1 with mild disc space narrowing at T11-T12 and T12-L1. Schnori's node at superior endplate of T12. Mild focal degenerative marrow signal at the superior endplate of L1." [AR 412]  It also revealed  "mild disc dessication throughout the cervical spine with mild disc bulges but not significant central canal stenosis." [AR 412]  As a result, I disagree with Plaintiff that the opinion of Dr. Coleman was not supported by the medical record and I conclude that the ALJ did not err in relying on the opinion of Dr. Coleman when assessing Plaintiff's RFC.

Plaintiff also argues that the ALJ's reliance on Dr. Warfield's opinion as to Plaintiff's mental impairments – as set forth in her assessment of his GAF score of 60 on July 21, 2010, during his psychiatric consultation – was a misinterpretation of the medical evidence. Specifically, he argues that the ALJ "appears to rely in part on the [GAF score of 60] that Dr. Warfield gave [Plaintiff] in assigning very few mental restrictions" in his RFC.   In so arguing, Plaintiff notes that the ALJ stated in his order that Dr. Warfield "assessed a GAF of 60, indicating the presence of mild mental limitations attributable to symptoms of depression by failing to support the existence of a chronic and severe depressive condition." [AR 35]  In addition, he notes that the ALJ indicated that Plaintiff's GAF score of 50 –  assessed by the Jefferson Center for Mental Health on July 12, 2010 when Plaintiff sought care for his depression and stress – supported "a moderate level of mental impairment at the time." [AR 35]

16

Plaintiff argues on appeal that a GAF score of 60 actually indicates moderate symptoms or difficulties in functioning (not mild) and that a GAF score of 50 actually indicates serious symptoms or difficulties in functioning (not moderate) and, as such, the ALJ misinterpreted Dr. Warfield's opinion as to Plaintiff's level of mental functioning.

As an initial matter, I note that a GAF score "taken alone does not establish an impairment serious enough to preclude an ability to work." *Holcomb v. Astrue*, 389 F. App'x 757, 759 (10th Cir. 2010)(*quoting Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)); *see also Drummond v. Astrue*, 895 F.Supp.2d 1117, 1132 (D. Kan. 2012)(noting that GAF scores do not directly correlate to the severity criteria used by the SSA and, thus, a GAF score without a narrative explanation from the source "is of little value in determining the severity of the claimant's impairments or the limitations resulting from [his or her] impairments"). Therefore, "the better and more thorough the narrative explanation given for the GAF score, the greater the consideration it must be given, and the greater the need for discussion in the decision." *Drummond v. Astrue*, 895 F.Supp.2d at 1132.

In this case the ALJ mischaracterized the GAF score assessed by Dr. Warfield of 60 as indicating the presence of "mild mental limitations" [AR 35] when, a GAF score in the range of 51- 60 actually indicates moderate symptoms or difficulties in functioning. *See Bronson v. Astrue*, 530 F. Supp. 2d 1172, 1181 (D. Kan. 2008)(noting that the American Psychiatric Association's Diagnostic and Statistical Manual (DSM IV) defining a GAF range of 51-60 as indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning). However, I disagree that such error resulted in a misinterpretation of Dr. Warfield's opinion as to Plaintiff's level of mental functioning. In her four page report, Dr.

Warfield made an Axis V diagnostic impression of "GAF: 60" without further explanation. [AR

773]  She then went on to conclude that Plaintiff:

> appears to be experiencing symptoms of depression related to chronic medical
> problems.  His cognitive abilities appear limited.  He should be able to
> understand, remember and carry out simple one-step instructions, but would
> likely have marked difficulty understanding and carrying out complex
> instructions. [Plaintiff] appears mild mannered however, in his interaction during
> this interview, thus it is though that it is likely he is mild mannered in social
> interactions and would be able to do . . . some limited work. [AR 73]

This conclusion specifically addressed Plaintiff's ability to work, while the assessed GAF

score only "says something in a very general way about ability to perform basic work activities,

the specific score assigned may relate more particularly to social or school functioning rather

than occupational functioning." *Bronson v. Astrue, supra,* 530 F. Supp. 2d at 1181.  The RFC

assessed by the ALJ – which limited Plaintiff to jobs that require only the ability to understand,

remember and carry out simple instructions – was consistent with the opinion of Dr. Warfield

and her assessment of a GAF score of 60.  *See Drummond v. Astrue*, *supra*, 895 F.Supp.2d at

1132 (to the extent that the score is inconsistent with the ALJ's findings, that inconsistency must

be resolved). As such, I conclude that the ALJ did not err in relying on Dr. Warfield's opinion,

when determining his RFC limitations, even when he apparently mis-characterized the two GAF

scores contained in the medical record.

## B.  Assessment of Plaintiff's Limitations Due to Pain

Plaintiff next argues that the ALJ failed to properly consider the effects of Plaintiff's pain

on his physical limitations.  He contends that the ALJ failed to adequately discuss or address

with specificity the "ample objective evidence" provided by Plaintiff that, he argues, establishes

that his pain produces functional limitations.  These include the July 2012 nerve study and the March 2010 MRI spine test results, as well as the evidence that he:  made multiple attempts to obtain relief; was prescribed strong narcotic medicines such as Dilaudid; and the fact that his daily activities were curtailed due to his pain.

When analyzing a claimant's evidence of pain, courts consider (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's pain is in fact disabling.  *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987).  In this case, there is objective medical evidence establishing a pain-producing impairment, as well as a loose nexus between the proven impairment and the subjective allegations of pain.  Thus, the ALJ was required to consider the claimant's assertions of disabling pain and decide whether he believed them.  *Id.* at 1489; *see also Branum v. Barnhart*, 385 F.3d 1268, 1273-74 (10th Cir. 2004)

To determine the credibility of pain testimony, the ALJ should consider such factors as: the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.  *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991)(quotation omitted).

The ALJ determined that Plaintiff's subjective complaints of pain were not credible to the extent that they were inconsistent with the limitations in his assessed RFC [AR 32], and

concluded that Plaintiff's "allegations are not fully persuasive concerning the extent of his functional limitations." [AR 35]  With regard to Plaintiff's chronic neuropathic pain in the lower extremities, the ALJ noted his complaints of pain increased over time, but found that the medical record "is without significant objective findings, failing to support an inability to engage in all sustained employment as alleged at the hearing." [AR 32-33]  The ALJ noted that, as discussed by Dr. Coleman, there are several instances in the record "where despite [Plaintiff's] alleged pain he had normal neurologic findings of the lower extremities, including normal sensation, strength and reflexes" and one examining doctor describing his pain and "muscular" in nature.  [AR 33] To the extent that Plaintiff contends that the nerve study testing, dated July 2012, is inconsistent with this finding, I disagree.  As discussed above, the nerve study only revealed "evidence of mild . . .  sensory and motor polyneuropathy." [AR 629]

As to Plaintiff's complaints of lower back pain, the ALJ found that "he has consistently had normal examinations of the spine and lower extremities, failing to support any significant limitations caused by this complaint." [AR 33]  Furthermore, "[a]t the time of Dr. Carson's April 2012 physical examination . . . [Plaintiff] had essentially normal spinal range of motion, normal gait, and intact sensory examination. [Plaintiff] moved about normally and did not shift positions while sitting.  He was diffusely, but only mildly tender in the legs and arms." [AR 33-34]  The ALJ noted that this examination is consistent with the probable fibromyalgia diagnosis based on multiple tender points. [AR 34]  Again, although the ALJ did not discuss it, the March 2010 MRI of Plaintiff's spine, which revealed only mild issues, is not inconsistent with these findings.

Most notably, the ALJ found that Plaintiff's own testimony supported the limitations assessed in his RFC "in terms of him being able to sit, stand and walk throughout an 8-hour work

day, so long as he is able to alternate potions," and his "testimony and other evidence also reflect activities of daily living that are not inconsistent with the restrictions found in this decision as he concedes that he is able to drive, cares for his dogs, does some chores around the house, prepares small meals, goes to the grocery and to the park with his family." [AR 33]

As such, despite Plaintiff's argument to the contrary,  I conclude that the ALJ's credibility analysis as to his pain and the resulting functional limitations was sufficient and supported by substantial evidence. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)(ruling that when the ALJ's credibility findings are closely and affirmatively linked to substantial evidence, the reviewing court will not "engage in an impermissible reweighing of the evidence.").

## C.  Job Duties of Past Work

Finally, Plaintiff takes issue with the ALJ's determination that he could perform his past relevant work as a service station attendant because the ALJ failed to make the requisite findings about the duties of the job as actually performed by Plaintiff, or the duties as performed in the general economy.

At step four of the sequential evaluation process, a claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform either the actual functional demands and job duties of a particular past relevant job, *or* the functional demands and job duties of the occupation as generally required by employers throughout the national economy. *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993)(*citing* SSR 82–61).  A "claimant bears the burden at step four of proving his inability to return to his particular former job and to his former occupation as that occupation is generally

21

performed throughout the national economy." *Id.*

It is uncontested that the ALJ did not make findings about the duties of the service station attendant job as actually performed by Plaintiff; rather, Plaintiff contends that the ALJ erred in concluding that he could do the job, given his assessed RFC, as the duties of the job are performed in the general economy set forth in the <u>Dictionary of Occupational Titles</u> (the "DOT").  At the hearing, the ALJ asked the vocational expert, Mr. Brauer, whether a person with the RFC ultimately assessed to Plaintiff could perform his past work.  Mr. Brauer responded yes, that he could perform the jobs of service station attendant (a low semi-skilled job with a specific vocational preparation (SVP) rating level of 3) and as a cashier II (an unskilled job with a SVP rating level of 2). [AR 879-80]  Also, in response to the ALJ's question, Mr.  Bauer testified that his testimony was consisted with the DOT. [AR 882-83]  In his order, the ALJ found that Plaintiff's "functional limitations as set forth in the residual functional capacity [as assessed] above would not preclude him from performing his past relevant work as a service station attendant (light, SVP 3), DOT# 915.477-010, as that job is generally performed" and, thus, he was found to be not disabled at Step Four. [AR 35]

Plaintiff asserts that this finding constitutes error because the ALJ failed to address the duties of a service station attendant – set forth in the DOT as performed in the national economy – as applied to Plaintiff's RFC which limits him to jobs where he can understand, remember and carry out only simple work instructions. [AR 31]  He argues that the applicable DOT designation of a station attendant (DOT# 915.477-010) defines the job as semi-skilled with an SVP rating level of 3, and that he is restricted to unskilled work – in that he can only understand, remember and carry out only simple work instructions – which he contends limits him to unskilled work

22

with an SVP rating level of 2.  *See Hackett v. Barnhart*, *supra*, 395 F.3d at 1176 (ruling that a claimant's RFC that only allows "the attention, concentration, persistence and pace levels required for simple and routine work tasks . . . seems inconsistent with the demands of level-three reasoning" in a DOT designation)(*citing Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997)).

I do not reach the question of whether Plaintiff's RFC in this case limits him to past work with an SVP rating level of 2, however, as the vocational expert also testified that Plaintiff was capable of performing his past work as a cashier II which, in turn, is defined as an unskilled job with an SVP rating level of 2 pursuant to DOT# 211.462-010.  Because the ALJ accepted the vocational expert's testimony that "his opinion is consistent with information contained in the Dictionary of Occupational Titles (SSR 00-4p)" [AR 35], I conclude that any error by the ALJ is harmless under the circumstances presented here, as Plaintiff would also be able to perform his past relevant work as a cashier II as that job is generally performed pursuant to DOT# 211.462-010. *See generally Alvey v. Colvin*, 536 F. App'x 792, 794 (10th Cir. 2013)(not selected for publication)(finding it appropriate to assess harmless error and avoid a futile remand).

ACCORDINGLY, for the foregoing reasons, I AFFIRM the Commissioner's final order.

Dated: November __12__, 2015 in Denver, Colorado.

BY THE COURT:

___s/Lewis T. Babcock_____
LEWIS T. BABCOCK, JUDGE

23